FILED
2015 Nov-05  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES E. BARBER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:15-cv-0997 |
| | ) | |
| CORIZON LLC; HUGH HOOD; ROY | ) | |
| RODDAM; JAMES BUTLER; CHERYL | ) | |
| PRICE; CEDRIC SPECKS; ANGELA | ) | |
| MARIE; JEFFERSON DUNN; UNKNOWN | ) | |
| CORIZON EMPLOYEES; UNKNWON | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| CORRECTIONS EMPLOYEES, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff, James E. Barber, Jr., by and through his attorneys, Loevy & Loevy, complains of Defendants Corizon LLC, Hugh Hood, Roy Roddam, James Butler, Cheryl Price, Cedric Specks, Angela Marie, Jefferson Dunn, Unknown Corizon Employees, and Unknown Alabama Department of Corrections Employees, and states as follows:

### Introduction

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Barber's rights as secured by the United States Constitution.

2.      Mr. Barber has been complaining to Defendants about the severe pain that he has been suffering in his left hip for several years.  During that time, Defendants have known that Mr. Barber suffers from degenerative joint disease.

Yet they have repeatedly failed to provide him with constitutionally adequate medical care.

3.      In January 2014, Mr. Barber was finally sent to an orthopedic specialist for a consultation.  The specialist determined that Mr. Barber had end-stage arthritis and needed hip replacement surgery.  Defendants refused to provide Mr. Barber with the surgery he needed.  Instead, they abruptly discontinued the narcotic pain medication that Mr. Barber had taken for years to manage his pain, causing Mr. Barber to suffer withdrawal.

4.      Defendants have also denied Mr. Barber an adequate medical evaluation or adequate treatment for the head and neck pain that he has suffered for the past year, and the large lump that he has developed behind his right ear.

5.      Finally, for more than four years, Defendants have denied Mr. Barber any meaningful access to the outdoor areas at Donaldson, violating his right to constitutionally adequate conditions of confinement.

**Jurisdiction and Venue**

6.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

## Parties

8.     Plaintiff James E. Barber, Jr. is in the custody of the Alabama Department of Corrections (ADOC).  At all times relevant to the events at issue in this case, Mr. Barber was housed at Donaldson Correctional Facility (Donaldson).

9.     Defendant Corizon LLC (Corizon) is a corporation headquarted in Tennessee transacting business in Alabama.  Corizon, pursuant to a contract with the ADOC, is a healthcare provider for ADOC prisons throughout the State of Alabama.  At all times relevant to the events at issue in this case, Corizon was responsible for the implementation, oversight, and supervision of policies and practices at Donaldson and the ADOC generally.  As an agent of the ADOC, Corizon was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual Defendants and other unknown healthcare employees at Donaldson.

10.     At all times relevant to his involvement in this case, Defendant Hugh Hood was a physician at Donaldson, an employee of and final policymaker for Corizon, and was responsible for the implementation, oversight, and supervision of policies and practices at Donaldson.  Defendant Hood is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Hood was acting under color of law and within the scope of his employment with Corizon.

11.     At all times relevant to his involvement in this case, Defendant Roy Roddam was a physician at Donaldson, an employee of and final policymaker for Corizon, and was responsible for the implementation, oversight, and supervision of

policies and practices at Donaldson.  Defendant Roddam is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Roddam was acting under color of law and within the scope of his employment with Corizon.

12.    At all times relevant to his involvement in this case, Defendant James Butler was a nurse practitioner at Donaldson, an employee of and final policymaker for Corizon, and was responsible for the implementation, oversight, and supervision of policies and practices at Donaldson.  Defendant Butler is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Butler was acting under color of law and within the scope of his employment with Corizon.

13.    At all times relevant to her involvement in this case, Defendant Cheryl Price was the Warden at Donaldson, an employee of the ADOC, and was responsible for the implementation, oversight, and supervision of policies and practices at Donaldson. Defendant Price is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Price was acting under color of law and within the scope of her employment with the ADOC.

14.    Defendant Cedric Specks is currently the Acting Warden at Donaldson, an employee of the ADOC, and is responsible for the implementation, oversight, and supervision of policies and practices at Donaldson.  Defendant Specks is sued here in both his individual capacity and his official capacity as Acting Warden at Donaldson.  Insofar as Plaintiff asserts claims against Defendant Specks in his

4

official capacity, those claims are for injunctive relief only.  At all times relevant to the events at issue in this case, Defendant Specks is acting under color of law and within the scope of his employment with the ADOC.

15.    In the alternative or in addition, Defendant Angela Marie is currently the Acting Warden at Donaldson, an employee of the ADOC, and is responsible for the implementation, oversight, and supervision of policies and practices at Donaldson.  Defendant Marie is sued here in both her individual capacity and her official capacity as Acting Warden at Donaldson.  Insofar as Plaintiff asserts claims against Defendant Marie in her official capacity, those claims are for injunctive relief only.  At all times relevant to the events at issue in this case, Defendant Marie is acting under color of law and within the scope of her employment with the ADOC.

16.    Defendant Jefferson Dunn is the current Commissioner of the ADOC, and has final responsibility for all policies and practices at ADOC facilities statewide.  Defendant Dunn is sued here in his official capacity as Commissioner of the ADOC.  Plaintiff asserts only claims for injunctive relief against Defendant Dunn.  As the Commissioner of the ADOC, Defendant Dunn acts under color of law.

Allegations

17.    In approximately 2004–2005, Mr. Barber began experiencing pain in his left hip, leg, and lower back.  The pain quickly escalated in severity until Mr. Barber could no longer engage in normal daily exercises like basketball at Donaldson.  Mr. Barber promptly reported his pain to medical staff at Donaldson.

5

18.     Dr. McQueen, one of the doctors at the facility, evaluated Mr. Barber and ordered an X-ray.  She determined that Mr. Barber suffered from degenerative joint disease in his hip.  (Degenerative joint disease is also known as osteoarthritis.)  Dr. McQueen told Mr. Barber that the degenerative joint disease would cause Mr. Barber's hip to deteriorate over time, and that there was no treatment for the disease except reconstructive surgery.  Dr. McQueen prescribed Mr. Barber 1300 millligrams (mg) of Tylenol three times per day to manage his pain.

19.     The Tylenol prescription did not relieve Mr. Barber's pain.  Instead, the pain in his left hip, leg, and lower back got progressively worse.  Mr. Barber continued to complain to medical staff about the pain that he was suffering.  Medical staff at Donaldson tried a variety of non-narcotic pain medications—including acetaminophen and nonsteroidal anti-inflammatory drugs (NSAIDs)—to relieve Mr. Barber's pain, but the medications did not work.

20.     Mr. Barber complained to Dr. Joseph Marino, the head physician at Donaldson at the time, on numerous occasions about the severe pain that he was suffering in his left hip, leg, and lower back.  Despite these complaints, Dr. Marino did not perform even a basic physical examination of Mr. Barber's left hip area.  He told Mr. Barber that he had "mild arthritis" and refused to treat or respond to Mr. Barber's repeated complaints of severe pain.

21.     During one encounter with Dr. Marino, Mr. Barber asked for an MRI.  Dr. Marino told him that he could not send him to an outside hospital for an MRI because of his security status.  During another encounter, Dr. Marino told Mr.

6

Barber that the company he worked for would not pay for surgery for Mr. Barber's left hip. During these encounters, Mr. Barber begged Dr. Marino to give him medication that would sufficiently manage his pain. Dr. Marino refused, and told him that he would not increase or adjust his prescription for Motrin (an NSAID).

22.     Mr. Barber continued to deteriorate.   In approximately 2011, Mr. Barber's pain became so severe that he was not able to stand. He was discovered lying on the ground by a nurse, who ordered him to be taken to the infirmary in a wheelchair. Dr. Marino again refused to perform an adequate examination of Mr. Barber or arrange for an X-ray or MRI of his left hip. Yet Dr. Marino did finally alter Mr. Barber's pain medication, prescribing him 5 mg of hydrocodone twice daily. Dr. Marino also prescribed Mr. Barber 400 mg of Ibuprofen daily for breakthrough pain.

23.     The hydrocodone afforded Mr. Barber substantial pain management for several months, but eventually the osteoarthritis in his left hip caused further cartilage deterioration and in the fall of 2012, the severe pain returned. Mr. Barber submitted multiple written requests for medical attention, complaining of his worsening condition and asking for medical treatment. On November 13, 2012, Dr. Marino increased Mr. Barber's prescription to 10 mg of hydrocodone twice daily, but he did not refer Mr. Barber to be examined by a specialist or arrange for any further testing of Mr. Barber's left hip.

24.     In approximately January 2013, Defendant Hood took over for Dr. Marino as head physician at Donaldson. On January 29, 2013, Dr. Hood saw Mr.

Barber.  He noted that Mr. Barber's pain increased when he moved his left hip, and confirmed that Mr. Barber suffered from degenerative joint disease.  He determined that Mr. Barber's pain was primarily associated with the degenerative joint disease and renewed his prescription for 10 mg of hydrocodone twice daily.  Like Dr. Marino, Dr. Hood did not refer Mr. Barber to be examined or treated by a specialist.

25.     Mr. Barber again began to experience excruciating breakthrough pain as his hip deteriorated.  He promptly requested medical attention and in February 2013 he saw Dr. Hood, who noted that Mr. Barber's signs and symptoms of pain increased when his left hip was rotated internally and externally.  Dr. Hood increased Mr. Barber's prescription to 10 mg of hydrocodone three times daily.  In April 2013, Dr. Hood again confirmed that "consistent findings" of osteoarthritis and cartilage loss in Mr. Barber's left hip.  Yet Dr. Hood did not refer Mr. Barber to an orthopedic specialist during either the February or April encounter.

26.     On October 8, 2013, Mr. Barber saw Defendant Roddam, who by that time had begun working at Donaldson.  Dr. Roddam noted that Mr. Barber had significantly limited motion in his left hip, including abnormal abduction and flexion.  He also noted that Mr. Barber's limited motion and complaints of pain were not consistent with the documentation of "mild degenerative joint disease" in Mr. Barber's medical record.  He recommended that Mr. Barber be referred to Dr. Powell, an orthopedic specialist, for a consultation.

27.     The appointment with Dr. Powell did not occur until more than 3 months later, on January 23, 2014.  Dr. Powell examined Mr. Barber and had X-

8

rays taken of Mr. Barber's left hip and pelvis.  Those X-rays showed that Mr. Powell
was suffering from "end-stage arthritis."  Dr. Powell concluded that Mr. Barber
could try an intra-articular steroid injection to relieve his suffering, but if that
failed, the "only treatment option" was a "total hip replacement."  Dr. Hugh
personally received Dr. Powell's findings and recommendations within a day.

28.     Mr. Barber agreed to try the intra-articular steroid injection, which Dr.
Powell provided during his visit with Mr. Barber.  The injection failed to provide
relief.

29.     On January 28, 2014, Dr. Roddam requested Mr. Barber return to Dr.
Powell for hip replacement surgery, according to Dr. Powell's recommendations.  He
noted that the steroid injection had failed and that Mr. Barber had been suffering
from this problem for several years.  Dr. Roddam also provided Dr. Hood with Dr.
Powell's report for a second time.  Dr. Hood denied Dr. Roddam's request without
explanation in the medical record, stating that Mr. Barber's degenerative joint
disease should be "manage[d] onsite."

30.     On information and belief, Dr. Roddam's request for hip replacement
surgery for Mr. Barber was denied based on Mr. Barber's status as a prisoner on
Alabama's death row and the cost to Corizon to provide the surgery.

31.     Unsurprisingly, Mr. Barber's pain continued to get worse.  By June of
2014, the pain was so great that Mr. Barber began having trouble breathing.  He
could not bend over for more than a few moments or walk for more than a few steps.
He begged Defendants and other medical staff at Donaldson for medical treatment.

Despite Mr. Barber's increase in pain, Defendants refused to adjust Mr. Barber's pain medication or reconsider their refusal to provide him with surgical treatment for his end-stage arthritis.

32.     Instead, on September 16, 2014, Dr. Hood decided to abruptly discontinue Mr. Barber's prescription for hydrocodone. Dr. Hood did not taper the cessation of Mr. Barber's hydrocodone prescription, but instead withdrew him from the drug abruptly.

33.     Following his abrupt withdrawal from hydrocodone, Mr. Barber began feeling the effects of opiate withdrawal, including excruciating pain, significantly elevated heart rate, nausea, and sweating. Not understanding why he was no longer receiving his hydrocodone prescription, Mr. Barber began filing several written requests for medical attention, complaining about the severe pain he was suffering. Despite these complaints, Dr. Hood, Dr. Roddam, and Defendant Butler (the nurse practitioner at Donaldson) refused to see Mr. Barber. In fact, Mr. Barber did not see a physician or nurse practitioner until approximately one month after he was abruptly withdrawn from hydrocodone.

34.     In October of 2014, Mr. Barber saw Mr. Butler. Mr. Barber told Mr. Butler about the pain he was suffering. In response, Mr. Butler simply increased Mr. Barber's prescription for Naprosyn, an over-the-counter NSAID. Mr. Butler took no further action to address Mr. Barber's complaints.

35.     In the weeks and months that followed, Mr. Barber repeatedly complained to Mr. Butler, Dr. Roddam, Dr. Hood, and other medical staff about the

10

unbearable pain he was suffering in his left hip, leg, and lower back, about his abrupt cessation of hydrocodone, and the inability of his current medications to provide any meaningful pain relief.  Yet medical staff did not provide Mr. Barber any minimally adequate treatment for his pain, and did not return Mr. Barber to Dr. Powell for hip reconstruction surgery.

36.     Mr. Barber continued to be denied narcotic pain medication—which Donaldson medical staff had determined after years of trial and error was the only medication effective to manage Mr. Barber's pain—until August 2015, when Dr. Roddam finally prescribed Mr. Barber 5 mg of hydrocodone three times daily. Given the level of deterioration in Mr. Barber's hip, however, he continues to suffer extreme pain even while with this hydrocodone prescription.

37.     To this day, Defendants continue to refuse to provide Plaintiff with hip reconstructive surgery.

38.     Beginning in approximately September 2014, Mr. Barber began suffering severe pain in his neck.  Mr. Barber noticed a large lump behind his right ear.  As time progressed, the lump grew.

39.     As with his other health complaints, Mr. Barber promptly notified medical staff at Donaldson about the lump and the pain that he was feeling.  As a result of his written complaints and requests for medical attention, Mr. Barber encountered Dr. Hood, Dr. Roddam, and Mr. Butler and told them directly about the pain and lump behind his ear.  Each Defendant failed to provide Mr. Barber with a proper evaluation of the lump and failed to provide him any minimally adequate

treatment for his pain.  Instead, Defendants told Mr. Barber that the lump was just part of the shape of his head or that it was just a sign of age.

40.     To this day, Defendants refuse to perform any adequate evaluation to determine the cause of Mr. Barber's head and neck pain and the source of the growing lump behind Mr. Barber's right ear.  They further refuse to provide him with any adequate treatment to relieve his symptoms.

41.     Prior to 2011, prisoners at Donaldson on death row were afforded the same outdoor privileges as non-death row prisoners, including regular access to the prison's "yard"—an outdoor space that is within the walls of the prison.  Beginning in approximately 2011, however, Defendant Price instituted a policy that prisoners on death row could no longer visit the yard or go outdoors.

42.     Warden Price's policy remains in effect to this day.  In fact, Mr. Barber and the other prisoners on death row have been outdoors just 6 times in the last 4 years.

## COUNT I
### 42 U.S.C. § 1983 – Denial of Medical Care (Eighth Amendment)
### Defendants Corizon, Hood, Roddam, Butler, Price, and Dunn

43.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

44.     As described more fully above, Defendants had notice of Mr. Barber's medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Barber if he did not receive appropriate medical care.  Despite that knowledge, Defendants failed to provide him with any proper medical care or access

to medical care, in violation of the Eighth Amendment to the United States Constitution.

45.     As a result of Defendants' unjustified and unconstitutional conduct, Mr. Barber experienced pain, suffering, emotional distress, and injury.

46.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Barber's rights.

47.     Alternatively, Defendants were deliberately indifferent to Mr. Barber's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Barber's rights.

48.     Mr. Barber's injuries were proximately caused by policies and practices of Defendants.

49.     At all times relevant to the events at issue in this case, Defendant Corizon contracted with the ADOC to provide healthcare to men housed at Donaldson, including Mr. Barber.  As the provider of healthcare services to prisoners incarcerated at Donaldson and other ADOC facilities, Corizon was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in ADOC custody.

50.     Prior to the events giving rise to Plaintiff's Amended Complaint, Defendant Corizon had notice of widespread policies and practices by healthcare and correctional employees at Donaldson pursuant to which prisoners like Mr.

13

Barber with serious medical needs were routinely denied medical care and access to medical care.  It is common at Donaldson to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees.  Despite knowledge of these problematic policies and practices, Defendant Corizon did nothing to ensure that prisoners at Donaldson received adequate medical care and access to medical care, thereby acting with deliberate indifference.

51.     Specifically, there exist widespread policies or practices at Donaldson pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with a serious medical condition; (4) healthcare personnel fail to provide timely healthcare to prisoners; (5) healthcare personnel fail to respond adequately or timely to diagnostic testing which reveals a serious medical need; (6) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; (7) healthcare personnel refuse to provide necessary treatment for improper reasons, such as cost of the prisoner's status on death row; and (8) healthcare

14

personnel abruptly discontinue prisoners' necessary pain medication without tapering the medication.

52.     These widespread policies and practices were allowed to flourish because Defendant Corizon, which directs the provision of healthcare services at Donaldson, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.  In this way, Defendant Corizon violated Mr. Barber's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

53.     The above-described widespread policies and practices, so well settled as to constitute de facto policy at Donaldson, were able to exist and thrive because Defendant Corizon was deliberately indifferent to the problem, thereby effectively ratifying it.

54.     At all times relevant to their involvement in this case, Defendants Hood, Roddam, and Butler were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at Donaldson; the training of ADOC and Corizon staff at Donaldson on providing medical care to prisoners, and providing prisoners access to medical care; and the supervision of ADOC and Corizon staff at Donaldson who provided medical care and were responsible for providing prisoners access to medical care.

55.     Prior to the events giving rise to Plaintiff's Amended Complaint, Defendants Hood, Roddam, and Butler had notice of widespread policies and practices by healthcare and correctional employees at Donaldson pursuant to which prisoners like Mr. Barber with serious medical needs were routinely denied medical care and access to medical care.  It is common at Donaldson to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees.  Despite knowledge of these problematic policies and practices, Defendants Hood, Roddam, and Butler did nothing to ensure that prisoners at Donaldson received adequate medical care and access to medical care, thereby acting with deliberate indifference.

56.     Specifically, there exist widespread policies or practices at Donaldson pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with a serious medical condition; (4) healthcare personnel fail to provide timely healthcare to prisoners; (5) healthcare personnel fail to respond adequately or timely to diagnostic testing which reveals a serious medical need; (6) healthcare personnel fail or refuse to arrange for prisoners

to be treated in outside facilities, even when an outside referral is necessary or proper; (7) healthcare personnel refuse to provide necessary treatment for improper reasons, such as cost of the prisoner's status on death row; and (8) healthcare personnel abruptly discontinue prisoners' necessary pain medication without tapering the medication.

57.     These widespread policies and practices were allowed to flourish because Defendants Hood, Roddam, and Butler, who oversaw the provision of healthcare to prisoners at Donaldson and were responsible for ensuring that prisoners have access to medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.  In this way, Defendants Hood, Roddam, and Butler violated Mr. Barber's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

58.     The above-described widespread policies and practices, so well settled as to constitute de facto policy at Donaldson, were able to exist and thrive because Defendants Hood, Roddam, and Butler were deliberately indifferent to the problem, thereby effectively ratifying it.

59.     At all times relevant to her involvement in this case, Defendant Price was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding prisoners' access to constitutionally adequate medical care and medication at Donaldson; the training of ADOC staff at

17

Donaldson on providing prisoners access to medical care; and the supervision of ADOC staff at Donaldson.

60.     Prior to the events giving rise to Plaintiff's Amended Complaint, Defendant Price had notice of widespread policies and practices by healthcare and correctional employees at Donaldson pursuant to which prisoners like Mr. Barber with serious medical needs were routinely denied medical care and access to medical care. It is common at Donaldson to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Price did nothing to ensure that prisoners at Donaldson received constitutionally adequate medical care and access to constitutionally adequate medical care, thereby acting with deliberate indifference.

61.     Specifically, there exist widespread policies or practices at Donaldson pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with a serious medical condition; (4) healthcare personnel fail to provide timely healthcare to prisoners; (5) healthcare

18

personnel fail to respond adequately or timely to diagnostic testing which reveals a serious medical need; (6) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; (7) healthcare personnel refuse to provide necessary treatment for improper reasons, such as cost of the prisoner's status on death row; and (8) healthcare personnel abruptly discontinue prisoners' necessary pain medication without tapering the medication.

62.     These widespread policies and practices were allowed to flourish because Defendant Price, who oversaw healthcare and correctional employees at Donaldson and was responsible for ensuring that prisoners had access to constitutionally adequate medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Price violated Mr. Barber's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

63.     The above-described widespread policies and practices, so well settled as to constitute de facto policy at Donaldson, were able to exist and thrive because Defendant Price was deliberately indifferent to the problem, thereby effectively ratifying it.

64.     Mr. Barber's injuries were caused by employees of ADOC and Corizon, including but not limited to the individually named Defendants, who acted

pursuant to the foregoing policies and practices in engaging in the misconduct described in this Count.

65.    Defendants continue to this day to refuse to provide Mr. Barber with constitutionally adequate medical care or medication and refuse to provide Mr. Barber access to constitutionally adequate medical care or medication, despite their clear knowledge of Mr. Barber's serious medical needs and their appreciation of the risk of continuing harm that their refusals to act pose to Mr. Barber.  Accordingly, he seeks injunctive relief from this Court to stop the continuing constitutional violation.

## COUNT II
### 42 U.S.C. § 1983 – Conspiracy
### Defendants Corizon, Hood, Roddam, Butler, and Price

66.    Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

67.    Defendants reached an agreement among themselves to deprive Mr. Barber of his constitutional rights and to protect one another from liability for depriving Mr. Barber of his rights, all as described in the various paragraphs of this Amended Complaint.

68.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

69.    The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Barber's rights.

70.     As a direct and proximate result of the illicit prior agreement referenced above, Mr. Barber's rights were violated and he suffered injuries, including pain, suffering, and emotional distress.

71.     Mr. Barber's injuries were caused by employees of the ADOC and Corizon, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

72.     Defendants continue to this day to conspire to deprive Mr. Barber of his constitutional rights and to protect one another from liability for depriving Mr. Barber of his rights, all as described in the various paragraphs of this Complaint. Accordingly, he seeks injunctive relief from this Court to stop the continuing constitutional violation.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)
### Defendants Corizon, Hood, Roddam, Butler, Price, and Dunn

73.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

74.     As described more fully above, Defendants had a reasonable opportunity to prevent the violation of Mr. Barber's constitutional rights as set forth above had they been so inclined, but failed to do so.

75.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Barber's rights.

76.     As a direct and proximate result of Defendants' misconduct, Mr. Barber's rights were violated and he suffered injuries, including pain, suffering, and emotional distress.

77.     Mr. Barber's injuries were caused by employees of the ADOC and Corizon, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

78.     Defendants continue to this day to refuse to provide Mr. Barber with constitutionally adequate medical care and to provide Mr. Barber access to constitutionally adequate medical care, despite their clear knowledge of Mr. Barber's serious medical needs and their appreciation of the risk of continuing harm that their refusals to act pose to Mr. Barber.  Other Defendants continue to fail to intervene on Mr. Barber's behalf.  Accordingly, he seeks injunctive relief from this Court to stop the continuing constitutional violation.

**COUNT IV**
**42 U.S.C. § 1983 – Conditions of Confinement (Eighth Amendment)**
**Defendants Price, Specks, Marie, and Dunn**

79.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

80.     Defendants Price, Specks, and/or Marie, as Acting Wardens at Donaldson, had a responsibility to ensure that prisoners at Donaldson have constitutionally adequate conditions of confinement.

81.     Defendants Price, Specks, and/or Marie had prior notice that Mr. Barber and other prisoners at Donaldson on death row were being denied access to

22

outdoors at the prison to a degree that constituted unconstitutional conditions of confinement.

82.     Upon information and belief, the refusal by prison staff to allow prisoners at Donaldson on death to visit outdoors was the result of a policy or widespread practice created by Defendant Price, and maintained by Defendants Speck and Marie.

83.     Defendants Price, Speck, and Marie acted with deliberate indifference to the risk of harm that depriving Mr. Barber and other prisoners at Donaldson on death row of access to outdoors caused.

84.     As a direct and proximate result of Defendants' misconduct, Mr. Barber's rights were violated and he suffered injuries, including pain, suffering, and emotional distress.

85.     Mr. Barber's injuries were caused by employees of the ADOC, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

86.     Defendants continue to this day to deprive Mr. Barber of constitutionally adequate conditions of confinement.  Accordingly, he seeks injunctive relief from this Court to stop the continuing constitutional violation.

## COUNT V
### Alabama Medical Liability Act
### Defendants Corizon, Hood, Roddam, and Butler

87.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

88.     In the manner described more fully above, the actions of Defendants Corizon, Hood, Roddam, and Butler breached the duty of care, diligence, and skill they owed to prisoners in their care.  They did so by failing to exercise the same level of reasonable care, diligence, and skill as other physicians and nurse practitioners ordinarily practice in the same general neighborhood, and in the same general line of practice as Defendants Corizon Hood, Roddam, and Butler.

89.     Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others.  Defendants were aware that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

90.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Barber suffered injuries, including pain, suffering, and emotional distress.

## JURY DEMAND

Plaintiff James E. Barber, Jr. hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: November 5, 2015

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Sarah Grady
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900