# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES EDWARD BARBER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:15-cv-00997-JHE |
| | ) | |
| CORIZON HEALTH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION[1]

On June 15, 2015, Plaintiff James Edward Barber, Jr. ("Barber"), a prisoner proceeding *pro se*, initiated this action against Defendants Corizon Health, Dr. Hugh Hood, Cheryl Price, and Dr. Roy Roddam,[2] asserting claims under 42 U.S.C. § 1983 that they had refused to treat his medical needs and had denied him access to outdoor recreation. (Doc. 1). On October 26, 2015, counsel appeared for Barber, (docs. 12 & 14), and on November 5, 2015, Barber amended his complaint, (doc. 18). The amended complaint reframed the original § 1983 claims and added as defendants James Butler, Cedric Specks, Angela Miree,[3] and Jefferson Dunn. (*Id.*). Specifically, the amended complaint asserts an Eighth Amendment denial of medical care claim against Corizon, Dr. Hood, Dr. Roddam, Butler, Price, and Dunn; a conspiracy claim against Corizon, Dr. Hood, Dr. Roddam, Butler, and Price; an Eighth Amendment failure to intervene claim against Corizon, Dr. Hood, Dr. Roddam, Butler, Price, and Dunn; an Eighth Amendment conditions of

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 31).

[2] The initial complaint incorrectly spells Roddam's surname as "Rodham." (*See* doc. 1).

[3] The amended complaint incorrectly spells Miree's surname as "Marie." (*See* doc. 18).

confinement claim against Price, Specks, Miree, and Dunn; and a medical malpractice claim against Corizon, Roddam, Hood, and Butler. (*Id.*). The defendants generally fall into two groups: the defendants involved with Barber's medical care (Corizon, Dr. Roddam, Dr. Hood, and Butler — the "Corizon Defendants") and the defendants employed by or overseeing the Alabama Department of Corrections (Price, Specks, Miree, and Dunn — the "ADOC Defendants"). Separately, the Corizon Defendants and the ADOC Defendants now move for summary judgment. (Docs. 71 & 72). The motions are fully briefed and ripe for review. (Docs. 79, 80 & 81). For the reasons stated below, each motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, the discovery, and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157,

(1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a Court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. V. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

Barber is a death row inmate at Donaldson Correctional Facility in Bessemer, Alabama. (Doc. 72-2 at 2-3 (4:1-8, 5:22-6:6)). Barber began noticing problems with his left hip in January 2004, shortly after he became incarcerated at Donaldson. (*Id.* at 6 (20:7-12)). On June 22, 2004, Dr. Sylvia McQueen, then the medical director at Donaldson, diagnosed Barber with osteoarthritis[4] in his left hip. (Doc. 72-2 at 9-10 (32:8-33-6); doc. 79-1 at 8). Dr. McQueen prescribed an NSAID and a muscle relaxant. (Doc. 72-2 at 10 (33:14-23); doc. 79-1 at 8).

From 2004 to 2008, various prison physicians continued to treat Barber's osteoarthritis with NSAIDs. (Doc. 72-2 at 11-12 (40:15-41:4)). X-rays taken during this period showed mild

---

[4] "Osteoarthritis" is synonymous with "degenerative joint disease," (doc. 72-8 at 9 (31:19-21)), and the two terms are used interchangeably in Barber's records and by the deponents in this case.

arthritis, but Barber testified the pain was progressively getting worse. (Doc. 72-2 at 11 (37:2-13, 38:9-39:4)). Beginning in September 2004 and continuing through February 2006, Barber complained to prison physicians that the medication was no longer working and that the pain affected his mobility and prevented him from exercising and sleeping. (Doc. 79-1 at 13-22).

In March 2009, the narcotic Ultram was added to Barber's prescription regimen. (Doc. 79-1 at 2, 86). Despite this new medication, between 2009 and 2012, Barber continued to report increased hip pain leading to loss of mobility and inability to sleep or sit for long periods. (*Id.* at 9, 47-48, 51, 60, 103-04, 107, 112-14, 116-19, 122, 125). Barber also requested increases in his medication's frequency or dosage, as by his reports the medication was no longer sufficient. (*Id.*). Barber was given a cane in January 2011. (*Id.* at 126).

In early 2013, Defendant Dr. Hugh Hood was serving as interim medical director at Donaldson. (Doc. 79-2 at 55 (213:5-14)). Dr. Hood saw Barber twice at Donaldson in early 2013. Barber's first visit with Dr. Hood occurred on January 29, 2013, after Barber reported hip and back pain. (Doc. 79-1 at 32; doc. 79-2 at 52 (204:10-13)). Dr. Hood observed Barber's osteoarthritis, noting increased pain on flexion and rotation of the hip joint and reduced pain on extension of the hip joint. (Doc. 79-1 at 32). Dr. Hood noted that the pain was "probably more related to degenerative joint disease of the left hip," but suspected Barber might also be suffering from a herniated disc. (*Id.*; doc. 79-2 at 54 (209:20-210:15). To differentiate the source of Barber's pain, Dr. Hood prescribed a tapered steroid regimen, which would potentially rule out the herniated disc. (Doc. 79-2 at 54 (210:6-211:3). Dr. Hood also prescribed Norco, a narcotic, at 5/325 twice per day for thirty days. (Doc. 79-1 at 27; doc. 79-2 at 58 (225:1-226:5).

Dr. Hood saw Barber approximately two weeks later for a follow-up visit. (Doc. 79-1 at 31). Barber reported no improvement from the steroid regimen, and Dr. Hood's notes reflect that

Barber's "[s]igns and symptoms worsen with internal and external rotation of the left hip." (Doc. 79-1 at 31; doc. 79-2 at 61 (240:4-10)). Dr. Hood testified his notes reflect that Barber's hip was getting worse. (Doc. 79-2 at 61 (240:21-25)). Dr. Hood switched Barber from Norco to the essentially identical narcotic Lortab at the same 5/325 dosage, but increased the frequency to three times per day for thirty days. (Doc. 79-1 at 31; doc. 79-2 at 58 (226:24-227:13) & 61 (238:23-239:17)).

In May 2013, Defendant Dr. Roy Roddam was hired by Corizon on a part-time basis to see inmates at the prison. (Doc. 72-6 at 4 (11:10-12:14)). Dr. Hood was Dr. Roddam's medical supervisor. (*Id.* at 4-5 (12:23-24)). Dr. Roddam saw Barber on July 30, 2013, noting his pain was thought to be caused by osteoarthritis (which had been confirmed by X-rays). (Doc. 79-1 at 31; doc. 72- 6 at 13 (45:16-23)). Barber saw Dr. Roddam again on October 8, 2013, reporting pain in his left hip at a consistent severity of 6 out of 10. (Doc. 79-1 at 30). Barber's hip flexion was 20 degrees with 0 degrees of abduction, contrasted with a normal hip's 150 degrees of flexion and 45-50 degrees of abduction. (Doc. 79-1 at 30; Doc. 72-6 at 15 (54:17-55:3); doc. 72-8 at 6 (19:16-20:11)).

Because Barber's subjective reports of pain were inconsistent with the x-rays showing mild or minimal osteoarthritis, Dr. Roddam ordered another X-ray. (Doc. 79-1 at 30; doc. 72-6 at 15 (54:6-16, 56:13-17)). Dr. Roddam also planned to have Barber undergo an orthopedic consultation with Dr. Thomas Powell to determine why Barber's subjective complaints were more severe than the minimal condition indicated by the objective evidence. (Doc. 79-1 at 30; doc. 72-6 at 15-16 (56:10-20)). Pursuant to Corizon policy, on October 8, 2013, Dr. Roddam submitted a request to

Dr. Hood requesting a consultation with Dr. Powell.[5]  (Doc. 79-5 at 2-3; doc. 79-6 at 2).  Dr. Hood

denied that request on November 8, 2013.  (Doc. 79-6 at 3).  Although Dr. Hood was required by

Corizon policy to document the reason for the denial, he did not do so; instead, Dr. Roddam directed

Dr. Roddam to "[m]anage on site."  (Doc. 79-5 at 2-3; doc. 79-6 at 3).

Barber saw Dr. Roddam again on November 26, 2013, stating his pain had worsened

progressively over the past six years.  (Doc. 79-1 at 29).  Between visits, Barber had undergone

another X-ray showing modest osteoarthritis with spurring.  (*Id.* at 29, 64).  Dr. Roddam tested

Barber's hip and found flexion to 40 degrees, causing significant pain, and painful internal and

external rotation.  (*Id.* at 29; doc. 72-6 at 16 (58:1-8)).  Dr. Roddam again noted Barber's subjective

reports were "out of proportion" to the X-ray findings and again indicated he planned to seek an

orthopedic consultation with Dr. Powell.  (Doc. 79-1 at 29; doc. 72-6 at 16 (60:9-16) & 17 (61:7-

18)).  The same day, Dr. Roddam submitted a second request for an orthopedic consultation to Dr.

Hood, which Dr. Hood approved.  (Doc. 79-6 at 4; doc. 72-6 at 36 (140:21-24)).

On January 23, 2014, Barber saw Dr. Powell at Brookwood Medical Center in Birmingham

Alabama.  (Doc. 79-7 at 3-4).  Dr. Powell's progress notes from the visit state:

> Mr. Barber presents complaining of left hip pain. He is Death Row inmate from
> Donaldson who complains of left hip pain that point where he has difficulty
> moving, bending, walking etc.  He is here for further evaluation and treatment.  He
> denies any specific injury to his left hip.
>
> . . .
>
> His left hip has about 100° of flexion but only 4/5 strength.  He has about 15° of
> external rotation, but no internal rotation and abduction is limited to maybe 15°
> with pain. Neurologically appears intact and there is no palpable tenderness.

---

[5] Notwithstanding this policy, Dr. Roddam testified he can override Dr. Hood if he believes
Dr. Hood is wrong.  (Doc. 72-6 at 46 (177:9-17)).

(Doc. 79-7 at 3). Dr. Powell testified that 4/5 strength was near normal, but that the ranges of motion were less than normal—fifty degrees fewer in flexion, thirty-five to forty degrees fewer in internal rotation, forty-five to fifty degrees fewer in external rotation, and thirty to forty-five degrees fewer in abduction. (Doc. 72-8 at 6 (19:3-20:11)). X-rays taken at the visit showed "end-stage arthritis of the left hip without evidence of fracture," which Dr. Powell testified was indicated by "bone spurs, joint space loss, irregularity of the femoral head." (*Id.* at 7 (23:6-9); doc. 79-7 at 3). As treatment for Barber's hip pain, Dr. Powell stated: "Today, we discussed [Barber's] options and I think it would be reasonable to at least try an intra-articular steroid injection, and he agrees. Otherwise, or if he fails that, the only treatment option would be total hip replacement." (Doc. 79-7 at 3). Dr. Roddam testified the X-rays taken at Dr. Powell's office supported the pain Barber had complained of, as they "showed a degree of osteoarthritis that was different than the X-ray film that had been taken at Donaldson," and that the reading of the X-rays resolved his confusion. (Doc. 72-6 at 24 (89:6-20) & 37-38 (144:25-145:16)). Dr. Roddam agreed with Dr. Powell's assessment of Barber's options. (*Id.* at 37 (144:16-20)).

Barber agreed to try the steroid injection. (Doc. 72-2 at 19 (69:1-12)). Dr. Hood verbally approved the procedure, and another doctor at Brookwood Medical Center administered the injection the same day. (*Id.* (69:11-12, 72:6-15); doc. 79-6 at 6; doc. 79-7 at 2). However, the injection was unsuccessful; Barber received only negligible relief from the steroids. (Doc. 72-2 at 20 (73:1-2); doc. 72-6 at 18 (65:19-66:2) & 20 (73:12-19)).

Dr. Powell submitted a provider consultation report to Dr. Hood the day of Barber's visit. (Doc. 79-6 at 5). In it, Dr. Powell noted the X-ray revealed "endstage OA L hip" and stated as his diagnosis and prescription suggestions: "OA L hip. Try intraarticular steroid injx. If fails – Total hip the only option." (*Id.*). Dr. Hood testified he understood Dr. Powell's diagnosis to mean that

Barber's osteoarthritis was advanced (and not mild or moderate) and his conclusion to mean that no intervention beyond total hip replacement would be successful. (Doc. 79-2 at 68 (267:14-268:9)). After reviewing the report, Dr. Hood circled "no further action" and commented only "noted." (Doc. 79-6 at 5). He testified he did so because he "didn't feel like a total hip replacement was medically necessary at this point," but that it would be "when his physical impairment, that is, his ambulation was such that he would no longer be able to access healthcare without assistance. When the — when pain relief was not adequate with reasonable pain medications that impaired his ability to walk and get to the — to the healthcare unit or around the — the prison, for requirements, that would be a consideration, or if he had a job in the prison where it was impairing his ability to perform his work, that would be an indication." (Doc. 79-2 at 68-69 (268:22-269:8)). Prior to Dr. Roddam's arrival at Donaldson, Dr. Hood had had conversations with two officers regarding Barber's ambulation, (*id*. at 48-50 (188:9-195:6)), but could not recall having any other conversations about Barber's ambulation or whether he had complaints of pain, including whether his pain or ambulation had gotten worse. (*Id*. at 69 (269:9-270:8)). Dr. Hood also testified use of a cane and/or a wheelchair would constitute "assistance." (*Id*.).

Reporting pain, Barber saw Dr. Roddam again on January 28, 2014. (Doc. 79-1 at 76). Dr. Roddam noted the pain continued despite the steroid injection and "[Dr. Powell's] thinking is [Barber] has end stage OA & total hip arthroplasty is next option." (*Id*.). As his treatment plan, Dr. Roddam wrote: "Consult filled out. Whether approved is another issue since [Barber] is on death row." (*Id*.). Dr. Roddam submitted a consultation request to Dr. Hood on the same day, requesting a total hip arthroplasty and noting in his objective findings that there had been a "failed

injection."[6]  (Doc. 79-6 at 7).  On February 2, 2014, Dr. Hood requested Dr. Roddam "please provide the disability associated with the affected hip joint and conservative measures which have failed."  (*Id*. at 8).  Dr. Roddam directed Dr. Hood to "See note by Dr. Powell" and re-requested the hip replacement.  (*Id*.; doc. 79-2 at 277:4-22)).  On February 27, 2014, Dr. Hood denied the request and offered an alternative treatment plan: "Manage on site."  (Doc. 79-6 at 9).  Dr. Hood had no independent recollection of the reason for this direction, although he testified it implied Barber did not have a disability preventing him from ambulating or accessing the healthcare unit without distress; in any event, he did not indicate this in the denial.  (Doc. 79-2 at 71 (278:21-280:14)).  Dr. Hood could not recall contacting Dr. Roddam about Barber's ambulation and did not contact Dr. Roddam about Barber's level of pain or treatment.  (*Id*.).  Dr. Roddam understood Dr. Hood's direction to mean that Barber would not get a hip replacement, and that the condition should be managed in other ways (e.g., pain management).  (Doc. 72-6 at 41 (158:24-159:21)).

Following the denial of the request, Barber continued to complain of "unbearable" pain, stating it interfered with his sleep and ability to move.  (Doc. 72-2 at 20 (74:23-75:5); doc. 79-1 at 38-46).  In July 2014, Barber twisted his right leg when he caught it in a crack in the prison's concrete floor.  (Doc. 72-2 at 20 (75:20-76:6)).  Barber saw Dr. Roddam on July 29, 2014, reporting pain in his right knee and left hip.  (Doc. 79-1 at 75).  Dr. Roddam again noted the steroid injection had been ineffective and that Dr. Powell had "suggested THR [total hip replacement] as only other option," but that the procedure had been previously denied.  (*Id*.).  Dr. Roddam's plan notes "UM [utilization management] for hip arthroplasty previously not approved."  (*Id*.).

---

[6] The consultation request mistakenly identifies the arthritic hip as the right hip and requests a right hip arthroplasty.  (Doc. 72-6 at 18 (65:8-12); doc. 79-6 at 7).  However, Dr. Hood did not include the error in his note reviewing the request.  (Doc. 79-2 at 70 (275:9-20)).

Barber had a follow-up visit on September 16, 2014, but saw Dr. Hood rather than Dr. Roddam. (Doc. 72-2 at 21 (77:18-78:19; doc. 79-1 at 74). Dr. Hood's notes indicate that he and Barber discussed the possibility of hip replacement; Barber testified Dr. Hood told him "we don't do surgery for mild arthritis" and stated Barber's X-rays supported mild arthritis, but Barber insisted Dr. Powell had recommended him for surgery. (Doc. 79-1 at 74; doc. 72-2 at 21 (79:5-11). Dr. Hood's notes indicate hip replacement was not medically necessary at that point "considering [Barber's] required level of activity." (Doc. 79-1 at 74). Instead, Dr. Hood's treatment plan was to "continue pain mgmt for knee & hip. Wheelchair & cane. F/u pain med renewal." (Doc. 79-1 at 74; doc. 79-2 at 64 (251:19-252:15)).

Dr. Hood testified he believed the degree of pain Barber reported seemed to be unsupported by medical findings and suspected Barber had not been taking his narcotic medication appropriately; therefore, he had the department of corrections perform a drug test on Barber and the inmates on either side of him. (Doc. 79-2 at 4-6 (11:21-13:16, 19:21-20:7)). The inmates in adjoining cells tested positive for opiates, despite not having prescriptions for narcotic medications. (Doc. 79-1 at 74; doc. 79-2 at 4 (21-24), 6 (19:21-20:7)). As a result, Dr. Hood discontinued Barber's Norco. (Doc. 72-2 at 21 (79:3-80:12); doc. 79-1 at 74). Dr. Hood could not recall whether the test on Barber had come back at the time he made his decision to discontinue the narcotic, but testified he was sure he would have indicated in the report had he known of the results. (Doc. 79-2 at 65 (254:2-255:9)). Barber ultimately tested negative for opiates two weeks after his medication was discontinued, but Dr. Hood testified he did not know how long it would have taken for the medication to be eliminated from Barber's system. (Doc. 79-1 at 37; doc. 79-2 at 65 (255:22-256:6)). Barber testified he was compliant in taking medications, including narcotics, as prescribed. (Doc. 72-2 at 22 (83:15-84:1) & 38 (150:16-151:1)). In any event, Dr.

Hood did not want to restart narcotics after the negative test, "as there is no indication for them." (Doc. 79-1 at 37).

In lieu of narcotics, Barber received NSAIDs for approximately one year. (Doc. 79-1 at 66-67). During this time period, Barber complained repeatedly that his medication was inadequate and that his hip pain was preventing him from walking, sleeping well, and using the bathroom. (*See* doc. 79-1 at 34, 38, 79-82).

On October 14, 2014, Barber saw Defendant James Dennis Butler, a certified registered nurse practitioner ("CRNP")[7] at Donaldson, on a complaint of hip pain. (Doc. 79-1 at 73). Barber told Butler he did not believe Dr. Hood understood the severity of his hip problem at the time Dr. Hood denied the hip replacement. (*Id*.). Butler reviewed Dr. Hood's note discontinuing Barber's narcotic pain medication and increased Barber's Naprosyn prescription. (*Id*.; doc. 72-7 at 30-31

---

[7] Butler described the scope of practice for a CRNP as follows:

A nurse practitioner, there are certain core skills, scope of practice that comes with being a nurse practitioner. One that you don't generally think of as being —as requiring an advanced medical license is being able to take a medical history. The first thing and probably the biggest thing that clearly distinguishes a registered nurse from a — from CRNP, certified registered nurse practitioner, or nurse practitioner, is the ability to make a medical diagnosis as opposed to what we term nursing diagnosis.

I can prescribe, within limits, legend drugs. I can order laboratory and certain diagnostic tests. I can refer patients for evaluation to psychologists, cardiologists, pulmonologists. If I think that the patient needs specialty care, it is within my scope of practice to refer.

I cannot admit to the hospital. I cannot do surgery. I cannot diagnose or follow — or actively follow anyone with cancer. I can do minor office procedures such as suturing lacerations.

(Doc. 72-7 at 13-14 (48:18-49:18)).

(116:17-118:8)).  Butler testified he would have been unable to prescribe narcotics, even had he felt them to be appropriate.  (Doc. 72-7 at 119:22-120:5)).  In a progress note on the same date, Butler noted Barber had stated he "did not want his wheelchair any more and left it in the hallway." (Doc. 79-1 at 73).  Butler then observed Barber walking with a limp and using his cane, but talking with others and not struggling to keep up.  (*Id.*).  Butler testified he had made this note "because of what it said about [Barber's] complaint of pain" earlier that day; Butler was "flabbergasted" that Barber had abandoned his wheelchair and did not seem to be in pain as he was walking.  (Doc. 72-7 at 37 (142:12-144:1)).

Barber saw Dr. Roddam on December 23, 2014, complaining of "real bad" hip pain.  (Doc. 79-1 at 72).  Dr. Roddam's notes state "Dr. Powell noted end stage OA & recommended THR. UM refused."  (*Id.*).  Dr. Roddam prescribed ibuprofen and Tylenol.  (*Id.*).

Barber next saw Dr. Roddam on February 10, 2015.  (Doc. 79-1 at 71).  Dr. Roddam noted X-rays had showed only modest osteoarthritis, and that it was "difficult to reconcile [Barber's] degree of pain & his X-ray findings in hip."  (*Id.*).  The notes also reflect Dr. Roddam planned to speak with Dr. Hood the next day regarding the reasons for the denial of the hip replacement.  (*Id.*). Dr. Roddam also wrote "Do not fill out UM" (i.e., the utilization management for the hip replacement), indicating he saw no reason to fill out another consultation request form without discussing the previous denial with Dr. Hood.  (*Id.*; doc. 72-6 at 23-24 (88:14-89:5)).  Dr. Roddam discussed the procedure with Dr. Hood at a provider meeting the next day.  (Doc. 72-6 at 23 (86:12-87:1)).  During that conversation, Dr. Hood stated the UM was not indicated; Dr. Roddam noted this in an addendum to his progress note.  (Doc. 72-6 at 24 (90:19-91:3); doc. 79-1 at 71).  Dr. Roddam recalled from the conversation that the UM was disapproved because Barber could have treatments other than arthroplasty: specifically, medical therapy in the form of drugs for Barber's

pain. (Doc. 72-6 at 24 (91:8-20)). Dr. Roddam also testified Dr. Hood stated to him the UM would not be approved because Barber had limited amounts of activity; he did not have a job, play basketball, or "traverse the prison." (*Id.* at 24-25 (91:23-95:15)).

Barber saw Dr. Roddam again on August 4, 2015, complaining that he could not use his hip any longer and that his medication did not work. (Doc. 79-1 at 70). Dr. Roddam's notes state "prior hip film shows mild OJD." (*Id.*). Dr. Roddam restarted Barber on narcotics and ordered another X-ray. (*Id.*). This X-ray was taken by MobilexUSA at Donaldson on August 5, 2015. (Doc. 72-6 at 41 (159:25-160:5)). According to the radiologist, the X-ray showed arthritis in Barber's left hip and a possible femoral fracture; the radiologist described the changes in the hip as "minimally worse" since the October 20, 2013 X-ray and indicated an orthopedic consultation would be required. (*Id.* (160:8-16); doc. 79-1 at 69). Dr. Roddam noted his intention to confirm whether a fracture was present through an MRI or CT scan and, if it was, order another consultation with Dr. Powell; additionally, Dr. Roddam planned to have Dr. Powell review the film. (Doc. 79-1 at 69).

The same day, Tomeka Sellers, a medical scheduler at Donaldson, emailed Kathy Green, Dr. Powell's assistant, requesting Dr. Powell review Barber's recent X-ray. (Doc. 72-8 at 18). Green replied: "Dr. Powell suggests that he get an intraarticular steroid injection. This will have to be done in radiology at Brookwood. He will probably eventually need a total hip replacement but certainly don't want to have to do that until much later on." (*Id.* at 19). On August 6, 2015, Sellers responded, inquiring if Dr. Powell agreed with the MobilexUSA radiologist that the subcapital femoral neck was fractured. (*Id.*). Green responded: "Dr. Powell said that he has pretty significant arthritis and doesn't think the fracture is significant enough to do anything for at this

point. He suggests keeping him nonweightbearing for 2-3 weeks, then re-x-ray and send us the films." (*Id*.).

Dr. Roddam ordered a CT scan, which was taken on August 20, 2015. (Doc. 72-6 at 38-39 (148:11-149:1)); doc. 72-8 at 26). The CT scan did not show a fracture but did show severe degenerative osteoarthritis of the left hip with complete loss of the superior lateral joint space and large subchondral cystlike change. Large marginal osteophytes are present. There is a small hip effusion." (Doc. 72-8 at 26). The impression of the physician who read the CT scan was "severe degenerative arthritis of the left hip without evidence of underlying fracture." (*Id*.).

Dr. Roddam noted the findings from the communications with Dr. Powell and the CT scan in an August 25, 2015 note after a follow-up visit with Barber. (Doc. 79-1 at 69). Dr. Roddam noted Tylenol did not help and made Barber "very nauseated," but that narcotics had been helpful. (*Id*.). This time, Dr. Roddam described Barber's condition as "severe OJD L hip." (*Id*.).

In late March or early April 2016, Dr. Hood contacted Dr. Powell, informing him of this lawsuit and requesting clarification of Dr. Powell's January 2014 note. (Doc. 72-8 at 4 (9:19-12:13)). Specifically, Dr. Powell testified Dr. Hood had requested he indicate whether his original note was intended to imply that "'there was an absolute urgency for a total hip replacement' or something to that nature," as "there was some question as to whether or not [Barber] needed a total hip arthroplasty immediately." (*Id*. at 4 (12:1-8), 5 (14:21-15:9)). On April 5, 2016, Dr. Powell wrote the following addendum:

> There has apparently been a lawsuit filed concerning Mr. Barber and his need for a total hip arthroplasty. As stated in the above note, at some point, Mr. Barber may be a candidate from an orthopedic standpoint, for a total hip arthroplasty, but in no way is this an emergency or even an urgency. This is an elective procedure. It is also my understanding that he sustained a left subcapital femoral neck fracture in August 2015, which was nondisplaced, and I reviewed the xrays and was not even certain that there was a fracture as I felt this was simply arthritic spurring but the

14

radiologist felt there was a fracture. As a result, I relayed a message via Mrs. Kathy Green, that in my opinion, the only treatment necessary at that time was non-weight bearing for several weeks.

(Doc. 79-7 at 6). Dr. Powell testified he intended to differentiate elective procedures from "emergent" (life-threatening) and "urgent" (limb-threatening) procedures. (*Id*. at 12-13 (44:3-45:4)).

Even with narcotic medication, Barber has continued to describe his pain as unbearable, (doc. 79-1 at 128), and has reported difficulty walking, (*id*. at 129), no mobility and an unusable hip, (*id*. at 131), extreme pain, (*id*. at 132, 134-35), inability to sit on a toilet due to pain, (*id*. at 133), and ineffective medication, (*id*. at 131, 135). Barber also testified his pain keeps him in his cell a lot of days and prevents him from staying out on others. (Doc. 72-2 at 7 (23:8-16)).

Conversely, various prison officials have testified they have observed Barber ambulating without pain. Leon Bolling, who has been a warden at Donaldson since 2015, testified he visits death row once a week, where the inmates are able to come out into the dayroom area. (Doc. 72-4 at 4 (12:15-16), 7 (23:9-19)). Bolling testified he sees Barber basically every time he goes to death row and has observed him walking both with and without a cane, although he could not say how often Barber uses the cane. (*Id*. at 16 (58:5-12, 59:21-60:4)). Bolling also stated Barber walks with a limp when he does not use a cane, but does not seem to be in pain; he denied having seen Barber grimace when walking. (*Id*. at 16 (59:16-20), 25 (94:13-23)). Defendant Angela Miree, who has been a warden at Donaldson since about April 2014, testified she has seen Barber able to walk himself from the death row unit to the health care unit without a wheelchair, cane, or other device, with no indications of pain or difficulty. (Doc. 72-5 at 9 (32:15-21), 33 (125:13-127:8)). Dr. Roddam testified he had also observed Barber ambulating without pain. (Doc. 72-6 at 30 (116:9-14)). Specifically, Dr. Roddam had observed Barber walking without pain or a

grimace when in the hallway outside his office, but begin hobbling as if he was in pain once inside the office. (*Id*. at 62 (242:5-243:5)).[8]  And, as described above, Butler testified he observed Barber having no real difficulty walking (albeit with a limp) after abandoning his wheelchair.

Barber has provided the expert report of orthopedist Dr. Robert Cusick.  (Doc. 79-3). Based on Barber's January 2014 X-rays, Dr. Cusick stated:

> These images show that at the time of the X-rays, Mr. Barber had stage 4 osteoarthritis in his left hip . . . There is no way to reverse osteoarthritis, although its progression can be slowed if it is caught in the early stages.  In other words, the damage documented in Mr. Barber's January 2014 X-rays will have progressed in the 34 months since the imaging; his hip will not have gotten any better.

> Stage 4 is the last stage in arthritic progression, and is sometimes referred to as endstage osteoarthritis.  By the time osteoarthritis progresses to stage 4, the joint space between the bones is significantly reduced, which causes the cartilage to wear off.  The wearing off of the cartilage typically causes marked stiffness of the joint. In addition, the breakdown of the cartilage often leads to chronic inflammation. Stage 4 osteoarthritis is commonly marked by the presence of bone spurs, which Mr. Barber's X-rays show that he has developed.

(Doc. 79-3 at 3).  Dr. Cusick indicated Barber's unmedicated pain levels from osteoarthritis would be unlikely to decrease in the future without treatment.  (Doc. 79-3 at 3).  The report also states Dr. Cusick's opinion that hip replacement is medically necessary, and that there is no medical reason to delay hip replacement, as osteoarthritis cannot be reversed without surgery and "it appears that as of January 23, 2014, neither NSAIDs no [sic] opioid pain medications provided sufficient relief." (*Id*.).  Consistent with Dr. Powell's deposition testimony, Dr. Cusick also opined that "emergent" and "urgent" relate, respectively, to life- and limb-saving procedures.  (*Id*. at 4).

---

[8] The Corizon Defendants also point to Dr. Roddam's deposition testimony describing what he meant by the phrase "ambulating adequately" and listing things Barber could do.  (Doc. 72-1 at 11 (citing doc. 72-6 at 26 (100:6-17)).  However, in context, this is not Dr. Roddam's observation of Barber's movements, but rather his interpretation of Barber's statement "I am hanging in there."  (Doc. 72-6 at 26 (99:22-100:4)) ("I think I — by the comment he made, that he was functioning satisfactory.  He was hanging in there.  He was ambulating adequately . . . .")

16

Notwithstanding hip replacement surgery is not required to save Barber's life or limbs, Dr. Cusick stated there is no reason to delay the treatment. (*Id.*).

### III. Analysis

In Barber's combined response to the summary judgment motions, he explicitly abandons the following claims: (1) his conspiracy claim against all Defendants, (Count II of his complaint); (2) his state law claims against all Defendants (Counts II and V); (3) his § 1983 claims for damages against the ADOC Defendants (portions of Counts I and III); his § 1983 claims for damages against Corizon (portions of Counts I and III); and all claims against the ADOC Defendants in their individual capacities. (Doc. 79 at 2 n.1 & 36 n.12).

### A. Claims against ADOC Defendants

Barber asserts claims against Defendant Jefferson Dunn in his official capacity; against Defendants Cedric Specks and Angela Miree in both official and individual capacities; and against Defendant Cheryl Price in her individual capacity only. (Doc. 18 at ¶¶ 13-16). The ADOC Defendants argue they are entitled to qualified immunity on Barber's individual capacity claims and Eleventh Amendment immunity against official capacity claims against them for money damages, and that there is no evidence to support the conspiracy claim. (Doc. 71 at 5-9, 18). Additionally, they argue Barber cannot recover damages against them as a general matter because his claims are barred by the Prisoner Litigation Reform Act. (*Id.* at 17). Because Barber has abandoned the claims they apply to, these issues are moot. Thus, the only claims that remain against the ADOC Defendants are: (1) Barber's claim under Count I (denial of medical care in violation of the Eighth Amendment) against Dunn, seeking only injunctive relief; (2) Barber's claim under Count III (failure to intervene in violation of the Eighth Amendment) against Dunn, seeking only injunctive relief; and (3) Barber's claims under Count IV (unconstitutional conditions

of confinement in violation of the Eighth Amendment) against Dunn, Specks, and Miree in their official capacities, seeking injunctive relief only. No claims against Price remain. Thus, this section addresses only the ADOC Defendants' remaining arguments: that Barber's complaint should be dismissed for noncompliance with the Federal Rules of Civil Procedure, and that they are entitled to summary judgment on Barber's conditions of confinement claim, and that Barber is not entitled to injunctive relief.[9]

### 1. "Heightened Pleading Standards"

In a section entitled "Heightened Pleading Standards," the ADOC Defendants argue the complaint must be dismissed because it fails to meet the pleading standards of Federal Rules of Civil Procedure 8, 11, and 23 because it is "solely based upon the naming of a United States Supreme Court case and an attached newspaper article" and is unaccompanied by an affidavit. (Doc. 71 at 15). The ADOC Defendants also generally invoke the requirements for standing. (*Id.* at 16-17).

The ADOC Defendants arguments are puzzling, because none of the claims they make about Barber's amended complaint appear to actually line up with the document. As Barber points out, Rule 23 is not germane to this case because it governs class actions, *see* Fed. R. Civ. P. 23, and there are no class allegations in the complaint. (Doc. 79 at 38-39). Additionally, the amended complaint does not have a newspaper article attached and does not cite any Supreme Court cases.

---

[9] The ADOC Defendants's motion for summary judgment also contains the argument they are entitled to summary judgment on the Count III failure to intervene claim, which is asserted against Price and Dunn. (Doc. 71 at 13-15). However, with the exception of a single sentence claiming Eleventh Amendment immunity for Dunn for any prior violations, the entirety of this section of the ADOC Defendants' motion is dedicated to Price's liability. Because Barber's claims against Price have been dismissed and Barber no longer seeks money damages against Dunn, these arguments are moot.

(*See generally* doc. 18).  The ADOC Defendants may intend to aim this argument at the original complaint (although it too does not appear to match the ADOC Defendants' description, (*see* doc. 1)), but if that is the case it still provides no basis for dismissal.  "An amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary."  *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir.2007) (cleaned up).[10]

Finally, it is unclear what the ADOC Defendants intend by their discussion of standing, as they fail to make any argument as to why it is relevant here.  The ADOC Defendants simply recite the criteria necessary to establish standing, although their block quote of the standard does not actually identify its source.  They neither connect this to a conclusion nor tie it to the substance of Barber's allegations.  The undersigned declines to take this undeveloped argument as a challenge to Barber's standing.

### 2. Count IV – Conditions of Confinement

Barber's amended complaint states that since 2011, a policy instituted by Price denies death row prisoners the outdoor privileges non-death-row prisoners enjoy, including access to the prison "yard."  (Doc. 18 at ¶¶ 41-42).  In Count IV, Barber alleges this amounts to unconstitutional conditions of confinement in violation of the Eighth Amendment, and that he has suffered injuries as a result.  (*Id.* at ¶¶ 79-86).  The ADOC Defendants contend they are entitled to summary judgment on this claim, citing evidence that Barber exercised outside or declined the opportunity to do so on multiple occasions in 2016.  (Doc. 71 at 10-13 (citing doc. 71-2)).

---

[10] "Cleaned up" is a new parenthetical used to indicate that extraneous, non-substantive material has been removed for the sake of readability. *See* Jack Metzler, *Cleaning Up Quotations* (March 17, 2017). J. APP. PRAC. AND PROCESS, 2018, Forthcoming. Available at SSRN: https://ssrn.com/abstract=2935374 or http://dx.doi.org/10.2139/ssrn.2935374.

Although Barber does not explicitly state he intends to concede this claim, he does not discuss it at all in his response. Therefore, he has abandoned the claim. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."). Consequently, the ADOC Defendants' motion is due to be **GRANTED** as to Barber's conditions of confinement claims.[11]

### 3. Injunctive relief

In a single sentence, the ADOC Defendants argue they are entitled to summary judgment on Barber's claims for injunctive relief because there is no underlying constitutional violation to support it. (Doc. 71 at 17). They do not develop this argument further. Barber correctly notes that an undeveloped argument does not shift the summary judgment burden. (Doc. 79 at 36) (citing *Zottola v. Anesthesia Consultants of Savannah, P.C.*, 169 F. Supp. 3d 1348, 1360 (S.D. Ga. 2013)). It is also unclear which constitutional claims the ADOC Defendants are addressing, but to the extent they direct their argument at Count IV it is moot. However, Barber also seeks injunctive relief in Counts I and III against Dunn, and the ADOC Defendants do not address at all the alleged constitutional violations underpinning those counts.

---

[11] In their reply, the ADOC Defendants argue Barber's claims against Specks must be dismissed on standing grounds. (Doc. 81 at 4). Because Count IV contains the last remaining claim against Specks, this argument is moot.

The ADOC Defendants' reply also argues they are due summary judgment because the complaint improperly fails to specify what injunctive relief is sought and because Barber cannot show either an injury or the lack of an adequate remedy at law. (Doc. 81 at 2-3). Because they were raised for the first time in a reply brief, these arguments are not properly before the court. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (citation omitted). Additionally, these arguments are wholly conclusory and undeveloped. Finally, these arguments are meritless as to Counts I and III, because Barber sufficiently specifies the injunctive relief he seeks, (*see* doc. 18 at ¶¶ 37, 65 & 78), has sufficiently alleged an injury, (*see, e.g., id.* at ¶¶ 29, 35), and § 1983 expressly authorizes equitable relief, including injunctive relief, *see Mitchum v. Foster*, 407 U.S. 225, 243 (1972). Therefore, their motion is **DENIED** to the extent Counts I and III survive, as discussed below.

### B. Claims against Corizon Defendants

As stated above, Barber has chosen to abandon his claims against Corizon itself to the extent they seek damages; instead, Barber seeks only injunctive relief against Corizon. (Doc. 79 at 2 n.1). Barber has also abandoned his Count II conspiracy claim and Count V medical malpractice claims, asserted against all the Corizon Defendants. (*Id.*). Therefore, the only remaining claims against the Corizon Defendants are: Count I, an Eighth Amendment deliberate indifference/denial of medical care claim asserted against Dr. Hood, Dr. Roddam, and Butler for damages and against Corizon for injunctive relief; and Count III, an Eighth Amendment deliberate

indifference/failure to intervene claim asserted against Dr. Hood, Dr. Roddam, and Butler for damages and against Corizon for injunctive relief.[12]

The United States Supreme Court has held that only deliberate indifference to serious medical needs is actionable under 42 U.S.C. § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A plaintiff must present evidence showing that he had a serious medical need, that the defendant acted with deliberate indifference in responding or failing to respond to that need, and that the defendant's wrongful actions caused an injury. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). "A serious medical need is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (cleaned up). An accidental or inadvertent failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Additionally, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. at 106. Neither will a mere difference of opinion between an inmate and the institution's medical staff as to treatment and diagnosis alone give rise to a cause of action under the Eighth Amendment. *See Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *see also Estelle v. Gamble*, 429 U.S. 97, 106-08 (1976). "In considering a deliberate indifference claim, each individual Defendant must

---

[12] Although nominally separate claims, none of the parties differentiate the denial of medical care and failure to intervene counts in any way in their briefing. (*See generally* docs. 72-1, 79 & 80). Therefore, to the extent summary judgment for a particular defendant is precluded, both counts will proceed; to the extent summary judgment is granted to a defendant, it will be granted as to both counts.

be judged separately and on the basis of what that person knows." *Melton v. Abston*, 841 F.3d 1207, 1224 (11th Cir. 2016) (cleaned up).

Deliberate indifference can be shown in a variety of ways. As the Eleventh Circuit has noted:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. Medical treatment that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness constitutes deliberate indifference. A doctor's decision to take an easier and less efficacious course of treatment also constitutes deliberate indifference. Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543-44 (11th Cir. 1995) (cleaned up). And a defendant may exhibit deliberate indifference by delaying necessary treatment for non-medical reasons. *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (citation omitted).

The Corizon Defendants do not contest that Barber has established a serious medical need. (Doc. 72-1 at 18). Therefore, as to each defendant, the questions are only whether that defendant was deliberately indifferent and whether Barber suffered an injury as a result.

### 1. Corizon

Barber states Corizon itself has not moved for summary judgment on his claims for injunctive relief. (Doc. 79 at 2 n.1). The Corizon Defendants dispute this, noting that injunctive relief is not a standalone claim, but is instead predicated on an underlying Eighth Amendment violation. (Doc. 80 at 14). The Corizon Defendants are correct, and they are similarly correct that their motion seeks summary judgment on behalf of Corizon for all of Barber's § 1983 claims. (*See* doc. 72-1 at 36-44). Notably, the standard required for Barber to obtain injunctive relief against Corizon is precisely the same as it is to obtain any other relief under § 1983. *See Monell v. Dep't*

*of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978) ("Local governing bodies" are "persons" for purposes of section 1983 and "can be sued directly under § 1983 for monetary, declaratory, **or injunctive relief** where ... the action that is alleged to be unconstitutional implements or executes a policy ... officially adopted and promulgated by that body's officers.") (emphasis added); *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 940 (11th Cir. 2017) (citing *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011)) ("A private entity, like Corizon, is subject to liability under section 1983 when it 'performs a function traditionally within the exclusive prerogative of the state,' such as contracting with the county to provide medical services to inmates because it becomes 'the functional equivalent of the municipality' under section 1983 when it performs such a function.").  Barber offers no evidence or argument in opposition to the Corizon Defendants' motion for summary judgment as it relates to Corizon's liability; therefore, he has abandoned his claims against Corizon.  *See Coalition for the Abolition of Marijuana Prohibition*, 219 F.3d at 1326.  The Corizon Defendants' motion is **GRANTED** as to Barber's claims against Corizon.

### 2. Dr. Hood[13]

Barber alleges Dr. Hood violated his Eighth Amendment rights through: (1) the February 27, 2014 denial of authorization to proceed with Barber's hip replacement; and (2) the September 16, 2014 decision to discontinue Barber's pain medications.  (Doc. 79 at 28-33).

---

[13] The Corizon Defendants' briefs generally conflate the conduct of the three individual defendants.  (*See* docs. 72-1 & 80).  Therefore, while specifically discussing Barber's claims against Dr. Hood, this section contains analysis applicable to Dr. Hood, Dr. Roddam, and Butler.

### a. Denial of hip arthroplasty

Viewed favorably to Barber, the evidence indicates at the time Dr. Hood denied Dr. Roddam's request for a hip arthroplasty, Dr. Hood had reviewed Dr. Powell's initial report—which found end-stage osteoarthritis and concluded the only treatments for the condition were a steroid injection and, failing that, a total hip arthroplasty—and was aware that the steroid injection had failed. (*See* doc. 79-6 at 5-9). The bulk of the Corizon Defendants' argument rests on their interpretation of Dr. Powell's opinion "that Barber is not, at this juncture, in need of total hip replacement surgery." (Doc. 79-1 at 27). They contend they were entitled "to rely on an outside, independent expert specialist to determine whether Barber was a candidate for hip replacement surgery." (Doc. 80 at 3-4). However, the evidence does not indicate that Dr. Hood relied on Dr. Powell's recommendations at all, because the only opinion by Dr. Powell at the time Dr. Hood denied Barber's hip replacement was that if the steroid injection failed, "the only treatment option would be total hip replacement." (Doc. 79-7 at 5). The Corizon Defendants emphasize Dr. Powell's deposition testimony, the September 2015 emails, and the April 2016 addendum to Dr. Powell's report, but Dr. Hood could not have relied on any of this evidence when he denied the request for a hip replacement because none of it existed at that point. Instead, the notes taken by the Corizon physicians—including Dr. Hood—after receiving Dr. Powell's report indicate they believed Dr. Powell had recommended hip replacement surgery. Specifically, Dr. Hood testified he took Dr. Powell's report to mean that, short of a total hip replacement, no intervention would be successful. (Doc. 79-2 at 68 (267:14-268:9)). This suggests rejection of Dr. Powell's opinion rather than reliance on it.

In any event, the additional sources that postdate the denial do not support the Corizon Defendants' contention that Dr. Powell has eliminated Barber at this or any other time as a

candidate for hip replacement surgery. At no point does Dr. Powell explicitly state this proposition. Instead, the addendum notes that "at some point, Mr. Barber may be a candidate from an orthopedic standpoint, for a total hip arthroplasty, but in no way is this an emergency or even an urgency. This is an elective procedure." (*Id.* at 6). Dr. Powell testified the first part of this means that "[i]f you are looking at it strictly from an orthopedist's view, which means you are looking at the X-rays and the physical exam, then, you know, he has got — he meets the criteria from those two reasons, if you will, his exam and his X-ray findings, to be a candidate for a total hip replacement." (Doc. 72-8 at 12 (43:14-20)). Contrary to the Corizon Defendants' contention, this does not suggest Barber was not yet a candidate for hip replacement surgery, but rather that non-orthopedic concerns are part of the equation. As to the second part, Dr. Powell contrasted an "elective procedure," with an "urgency" or "emergency." (*Id.* (44:3-11)). Clarifying this, Dr. Powell stated: "Life-threatening is emergent. Limb-threatening is oftentimes urgent. Depending on who you ask, if may be considered emergent. There are very, very, very few orthopedic injuries or conditions that are emergencies." (*Id.* at 12-13 (44:22-45:4)). This indicates only that Barber's osteoarthritis would not be expected to endanger his life or limbs (which Barber does not contend is the case), not that Barber's condition had not yet progressed to the point where a hip replacement would be necessary. While the emails in September 2015 are a somewhat closer call, Dr. Powell's ultimate recommendation was that Barber receive a steroid injection—a procedure that that Dr. Hood and Dr. Roddam (but not Dr. Powell, (*see* doc. 72-8 at 9 (29:21-30:2)) knew had already been tried with no success—before considering a hip replacement. This was essentially identical to Dr. Powell's previous recommendation. Notably, there is no evidence a second steroid injection was attempted. And even assuming Dr. Hood had taken "much later" as contingent (i.e., hip replacement would be indicated in the future provided some set of conditions were met), the

evidence does not suggest Dr. Hood made any effort to determine what would satisfy this recommendation.

At best, then, Dr. Powell's opinion stands for the fact that Barber's osteoarthritis requires hip arthroplasty, but that the need does not require the surgery be scheduled at a defined time because it will not result in danger to Barber's life or limbs. (Doc. 72-8 at 16 (58:13:17, 59:16-19)). The tolerable length of delay in providing medical attention, even in a nonemergency situation, depends on the nature of the medical need and the reason for the delay. *Harris v. Coweta Cty.*, 21 F.3d 388, 393 (11th Cir. 1994). Dr. Powell testified at length about the types of things that might provide a reason to delay arthroplasty. Some people, Dr. Powell testified, might simply not be ready for a hip replacement from a patient choice standpoint. (Doc. 72-8 at 7 (24:11-15). Some had received a hip replacement on the other side. (*Id.* (24:16). Some might be tolerant of pain, or have other medical conditions for whom the risk of surgery outweighed the benefits of replacement, or have a terminal condition that would essentially consume the rest of the patient's life in recovery. (*Id*. at 8 (25:1-26:11). Conversely, the reasons Dr. Powell offered for when the procedure ought to be done boil down to unmanageable pain and immobility. (*Id*. (26:18-28:21)). Taken favorably to Barber, the evidence indicates Barber's pain was not effectively managed on the prescription medications he was given and his mobility is impaired to the point where he struggles with day-to-day activities, such as using the bathroom, tying his shoes, and ambulating without assistance. The evidence also indicates Dr. Hood did not take any steps to investigate Barber's pain or mobility at the time of the denial such that he could have determined whether the hip replacement would be medically indicated, despite ostensibly basing his judgment the procedure was unnecessary on Barber's adequate pain relief and ambulation. (Doc. 79-2 at 68-69 (268:22-270:8)). When he denied the hip replacement, Dr. Hood had not seen Barber in a medical

context in approximately eight months, (*see* doc. 79-1 at 31; doc. 79-2 at 62 (241:23-24))), and he could not recall discussing Barber's ambulation with anyone since his conversations with prison guards prior to Dr. Roddam's May 2013 hire date, around nine months prior to the denial, (doc. 79-2 at 48-50 (188:9-195:6), 69 (269:9-270:8)). Nor did Dr. Hood contact Dr. Roddam to discuss Barber's pain or ambulation. (*Id*. at 71 (278:21-280:14)). While other witnesses testified they observed Barber ambulating without pain, Dr. Hood's testimony does not support that he himself had done so. A reasonable jury could conclude Dr. Hood's stated reasons for delaying the hip arthroplasty (which, notably, he did not articulate at all at the time he denied the procedure) were a sham, or even credit the alternative, non-medical reason Barber suggests motivated the delay: as Dr. Roddam's comment that "whether [the procedure is] approved is another issue since [Barber] is on death row," (doc. 79-1 at 76), arguably supports, that the procedure was denied because Barber is a death row inmate, not because Dr. Powell did not consider Barber to be a candidate for the procedure. Additionally, the record contains ample evidence Barber had complained (and continued to complain) of pain and mobility issues even with the medication Dr. Hood provided such that a jury could conclude Dr. Hood's decision to deny the hip arthroplasty and treat him with medication that did not appear to address Barber's pain was grossly inadequate care or an easier but less efficacious course of treatment, either of which would support Dr. Hood's deliberate indifference. *See Adams*, 61 F.3d at 1543-44. *See also McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) ("[P]rison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness.")

The Corizon Defendants contend Barber's claims are simply that different treatment should have been provided, which amounts to a non-actionable medical judgment call. (*Id*. at 21-30).

However, this case is similar to *Melton v. Abston*, 841 F.3d 1207 (11th Cir. 2016), in which the Eleventh Circuit held the plaintiff stated a claim for deliberate indifference. In *Melton*, the plaintiff repeatedly complained of severe pain associated with a broken left arm. *Id*. at 1215. A doctor contracted by the jail to provide inmate care prescribed ibuprofen to relieve the pain, but the plaintiff complained the ibuprofen was not working and no other treatment was provided. *Id*. Eventually, jail staff permitted the plaintiff to see an orthopedist. *Id*. at 1216. The orthopedist diagnosed a humeral fracture, but the plaintiff was returned to the jail without treatment. *Id*. Several months later, the plaintiff returned to the orthopedist for a consultation, after which the orthopedist noted: "Really the only option I have at this point would be to proceed with operative intervention with repair of the nonunion." *Id*. Asked to clarify whether the need for surgery was urgent, the orthopedist issued an addendum that included: "Obviously at some point in time in the future this will need to be operatively addressed however there is no emergent nature to that problem." *Id*. The jail doctor refused to authorize the procedure until the plaintiff paid the expenses for it. *Id*. The plaintiff continued to receive ibuprofen, as well as other medication he could not tolerate, continuing to complain that the medications did not effectively relieve his pain. *Id*. at 1217-18. The Eleventh Circuit reversed the district court's grant of summary judgment to the doctor, concluding the evidence could support a jury's conclusion the doctor's care—offering ineffective pain medications in the face of complaints that the medications did not relieve the plaintiff's pain and refusing to authorize surgery after the orthopedist indicated it was "the only option"—constituted deliberate indifference. *Id*. at 1226.

Here, the course of treatment was similar. The nature of the medical need in both situations is comparable: a painful condition ultimately treatable only through surgery. As with the plaintiff in *Melton*, Barber was given medications he contended were ineffective in treating his pain. The

orthopedist in *Melton* issued a recommendation much like Dr. Powell's, noting no option other than surgery to treat the condition, and an addendum similar to Dr. Powell's statements that the procedure would eventually need to be done but was not an emergent or urgent procedure. While the defendants in this case lack the explicit financial motive for denial of care that the defendants in *Melton* showed, as discussed above, the evidence creates a fact issue as to whether Barber was denied the hip replacement due to his status as a death row inmate—a different non-medical motive, but a non-medical motive just the same. With these analogous facts, the Corizon Defendants are incorrect in stating that Barber's claims, as they relate to his osteoarthritis, are solely a matter of a difference of medical opinion.

Finally, the Corizon Defendants argue the only evidence Barber offers of ambulation problems and accompanying pain is his own self-serving testimony, which is contradicted by several witnesses. (Doc. 72-1 at 28; doc. 80 at 11). That Barber's statements are self-serving is not a basis to disregard them at summary judgment. *See Feliciano v. City of Miami Beach,* 707 F.3d 1244, 1253 (11th Cir. 2013) (Stating, with respect to self-serving statements by the plaintiff, "[a]s a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."). And while the Corizon Defendants cite a variety of cases for the proposition that no fact issue exists when a plaintiff's claims contradict contemporaneous medical records, (*see* doc. 72-1 at 27-28), such is not the case here; Barber's claims of ambulatory problems and associated pain are consistent with the medical records, which show him repeatedly complaining over the course of years about precisely those issues. Additionally, Dr. Cusick's report provides evidence that the type of pain Barber claims is common in end-stage osteoarthritis

patients, even if it does not support that Barber himself experiences that pain.[14] (*See* doc. 79-3 at

3). Therefore, a genuine issue of material fact exists with respect to Barber's ability to adequately

ambulate.

Because a genuine issue of material fact exists as to whether Dr. Hood was deliberately

indifferent by denying authorization for Barber's hip arthroplasty, the Corizon Defendants' motion

for summary judgment is due to be **DENIED** as to this issue.

### b. Discontinuation of narcotics

Barber also briefly contends Dr. Hood was deliberately indifferent by taking him off

narcotics in September 2014 with no evidence of misuse and without ensuring that he would not

suffer withdrawal symptoms. (Doc. 79 at 33). The problems with this claim are twofold. First,

Barber has not established a dispute of fact as to injury from Dr. Hood's decision to discontinue

narcotics because Barber has consistently reported pain at roughly the same high levels, with or

without narcotics, and contends "both narcotic pain medication and NSAIDs are insufficient to

address his excruciating pain." (*See* doc. 79 at 37). (*See also*, *e.g.,* doc. 79-1 at 128 ("unbearable"

pain on narcotics), 131 ("totally ineffective" medication, including narcotics)). Similarly, Barber

has reported essentially the same problems with ambulation and daily living on both types of drugs.

---

[14] Although they do not couch it as an evidentiary objection, the Corizon Defendants argue Dr. Cusick's report is undermined by the fact that he provided his report as a favor to one of the named partners at Barber's counsel's firm, who is a childhood friend. (Doc. 72-1 at 29-30) (citing Doc. 72-9 at 3 (5-7)). Assuming this arrangement could be construed as problematic, it would go only to the weight of the evidence and not its admissibility. *See United States v. 0.161 Acres of Land, more or less, situated in City of Birmingham, Jefferson Cty., Ala.*, 837 F.2d 1036, 1040-41 (11th Cir. 1988) (A jury "is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion."). The Corizon Defendants also suggest the materials Dr. Cusick reviewed (which did not include Barber's medical records or depositions in this case) undermine his opinion, but this again is a question of weight; it does not suggest Dr. Cusick's opinion is inadmissible summary judgment evidence.

(*Compare* doc. 79-1 at 34, 38, 79-82 (complaints on NSAIDs only) *with* 129, 133, 135 (complaints on narcotics)). While switching from an effective medication to an ineffective medication might establish deliberate indifference, Barber cannot contend that switching between two ineffective medications injured him, especially when he offers no evidence that Dr. Hood should have known Barber would experience withdrawal symptoms (which Barber does not actually allege he experienced). Second, it is undisputed that Barber's narcotics were discontinued on Dr. Hood's suspicion, backed by the drug tests of his cellmates, that Barber had been providing his narcotic medication to other inmates. Barber contends Dr. Hood could have done more to investigate the matter, but does not contest the underlying facts beyond suggesting this could have been a pretext to deny him his narcotics. At best, this suggests Dr. Hood engaged in a negligent investigation, which is not an actionable Eighth Amendment claim. *Cf. McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (a plaintiff must "show more than mere negligence to establish a violation of the Eighth Amendment"). Therefore, the motion for summary judgment is **GRANTED** to the extent it asserts a deliberate indifference claim against Dr. Hood for discontinuing Barber's narcotic medication.

### 3. Dr. Roddam

Barber concedes Dr. Roddam was not initially deliberately indifferent when presented with Dr. Powell's report, as Dr. Roddam put in several requests for hip arthroplasty. (Doc. 79 at 34). Instead, Barber argues Dr. Roddam was deliberately indifferent through failing to act on his own after Dr. Hood denied authorization for the hip arthroplasty. (*Id.*).

The Corizon Defendants' arguments regarding Dr. Powell's alleged elimination of Barber as a candidate for hip arthroplasty are even less availing when applied to Dr. Roddam than they were as to Dr. Hood. Not only did Dr. Roddam concur with Dr. Powell's analysis of Barber's

options, but his notes reflect that he believed Dr. Powell had recommended a hip arthroplasty at the time Dr. Hood denied the request and afterward. (*See* doc. 79-1 at 76 ("Dr. Powell's thinking is . . . total hip arthroplasty is next option"), 72 ("Dr. Powell . . . recommended THR.")). Dr. Roddam also testified he believed the procedure to be medically necessary when he submitted the utilization management request to Dr. Hood because he relied on Dr. Powell's assessment. (Doc. 72-6 at 40 (154:12-15), 64 (251:10-252:1)). Dr. Roddam cannot claim to have relied on what the Corizon Defendants now characterize Dr. Powell's opinion to be when contemporaneous records belie that characterization. And given Dr. Roddam's testimony he could override Dr. Hood if he believed Dr. Hood to be wrong, (doc. 72-6 at 46 (177:9-17)), and his belief the hip arthroplasty was medically necessary, a reasonable jury could conclude Dr. Roddam's decision not to override Dr. Hood was a deliberately indifferent decision to pursue an easier but less efficacious course of treatment. Therefore, the motion for summary judgment is due to be **DENIED** as to Barber's claims Dr. Roddam was deliberately indifferent by failing to override Dr. Hood's denial of the hip arthroplasty.

### 4. Butler

Barber's claims against Butler, presented in a single brief paragraph, consist only of inaction in the face of Dr. Hood's decision to discontinue Barber's narcotic medication in September 2016, i.e., that Butler "did not refer Mr. Barber to a physician to determine whether restarting his narcotic pain medication was appropriate and he did not request that Mr. Barber be referred to an orthopedist for further evaluation." (Doc. 79 at 35-36). Effectively, Barber's argument is that Butler could conceivably have done more to treat him. This is insufficient to establish an Eighth Amendment violation. *See Adams*, 61 F.3d at 1547 ("[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic

example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment."). Barber does not point to any evidence that would indicate Barber's subjective knowledge that failing to seek additional treatment would have posed an excessive risk to Barber's health or safety, only to Butler's knowledge of his complaints of pain and trouble ambulating. Nothing Barber alleges with respect to Butler suggests anything beyond the exercise of medical judgment. Therefore, the Corizon Defendants' motion is **GRANTED** with respect to Barber's claims against Butler.

## IV. Conclusion

For the reasons stated above, the ADOC Defendants' motion for summary judgment, (doc. 71), is **GRANTED** as to Barber's claims against Specks, Miree, and Price, and all claims against Dunn except for claims for injunctive relief in Counts I and III; it is **DENIED** in all other respects. The Corizon Defendants' motion is **GRANTED** as to Barber's claims against Butler and Corizon and as to his claims of deliberate indifference against Dr. Hood for his discontinuation of Barber's narcotic medication; it is **DENIED** in all other respects.

The following claims will go forward: Counts I and III against Dr. Hood and Dr. Roddam for damages and injunctive relief and against Dunn for injunctive relief only. The parties are encouraged to discuss alternative dispute resolution, including the potential for mediation. The parties are **ORDERED** to file a joint status report by **April 20, 2018**, regarding the status of such discussion and whether they believe mediation would be beneficial to the resolution of the remaining claim.

DONE this 30th day of March, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE